UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MARK PAYNE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:25-cv-00232-SRC |
| ) | |
| WAL-MART STORES EAST I, LP ) | |
| and KAILIE BESS, ) | |
| ) | |
| Defendants. ) | |

**Memorandum and Order**

In 2017, Missouri enacted a new law providing exclusive remedies for claims for damages or injury arising out of an employment relationship. The Missouri appellate courts have not had occasion to determine the scope and contours of that law. This case presents novel questions of interpretation of that law, particularly as to an allegedly fraudulently joined defendant. The presence of that defendant destroys diversity, and this Court accordingly lacks subject-matter jurisdiction. The Court therefore remands the case to state court.

**I.    Background**

**A.    Factual background**

In his complaint, Mark Payne alleges the following. He "is male," "disabled," and "a military veteran." Doc. 6 at ¶¶ 15–17. Around 2017 or 2018, Payne "was diagnosed with occupational asthma" and, around January 2022, he "was diagnosed with anxiety." *Id.* at ¶¶ 18, 20. Payne, around June 2022, began working as a cashier "at the Walmart store in Sullivan, Missouri," and when he did, he "disclosed his occupational asthma and anxiety diagnoses to Walmart." *Id.* at ¶¶ 22–23.

Around August 2022, Payne "started dating a female co-worker by the name Taylor Smith" who, at the time Payne filed his complaint, "[was his] fiancé." *Id.* at ¶¶ 25–26. "Shortly after other co-workers became aware that" Payne "and Taylor were dating," Maxine Maddox, a team lead in the front-end department, and another team lead "frequently made comments about" Payne "and Taylor spending their breaks together and about them working in the same area of the [s]tore together." *Id.* at ¶¶ 27–28. Around that time, Ursula Williams became Payne's supervisor, and from that point on, Payne "experienced a plethora of difficulties throughout the remainder of his employment at Walmart." *Id.* at ¶¶ 29–30.

Around September or October 2022, Payne "was diagnosed with hypoglycemia." *Id.* at ¶ 31. He "disclosed his hypoglycemia diagnosis and need for accommodation to Walmart." *Id.* at ¶ 33. After Payne's doctor completed documentation and issued Payne "various work restrictions," Payne, "[w]ith these reasonable accommodations," could "perform the essential functions of the [c]ashier position." *Id.* at ¶¶ 35–38. Around the same time, Payne "reported the inappropriate comments by his co-workers about" him "and Taylor dating to" Kris Williams, the store manager. *Id.* at ¶ 39. To Payne's knowledge, Kris Williams "did nothing to address the inappropriate comments or to prevent them from recurring in the future." *Id.* at ¶ 40.

"On several occasions throughout" Payne's "employment," he "was told that employees were not permitted to wear military hats." *Id.* at ¶ 41. Payne understood that "there was an employee that had made a complaint about other employees wearing apparel bearing the American flag," but Payne, "[a]s a military veteran," "took offense to being told that he could not wear apparel bearing the American flag as an employee of Walmart." *Id.* at ¶¶ 42–43.

Around September or October 2022, Ursula Williams and Maddox "made threats regarding writing up and firing employees if they did not promote 5-star surveys or if customers

2

left items behind that they purchased." *Id.* at ¶ 44.  Payne, "Taylor, and many other co-workers complained about these threats," but to Payne's knowledge, "Walmart's only response . . . was brushing them off and providing the excuse that Ursula" Williams and Maddox "just had 'bubbly' personalities." *Id.* at ¶¶ 45–46.  Around November 2022, Payne "reported to Walmart Ethics the ongoing inappropriate comments by his co-workers about" him "and Taylor dating," but to his knowledge, "Walmart Ethics did nothing to address said inappropriate comments or to prevent them from recurring in the future." *Id.* at ¶¶ 47–48.

Around January 2023, Payne's "request for accommodation regarding his hypoglycemia diagnosis was partially approved and he was provided some accommodations," but Maddox "frequently violated" Payne's "accommodations and company policy by throwing" Payne's drinks and snacks "into the trash." *Id.* at ¶¶ 49–50.  Ursula Williams also "violated" Payne's accommodations "by refusing to provide him his additional break time and refusing to allow him to get a snack or drink." *Id.* at ¶ 51.  Around May 2023, "multiple co-workers told" Payne "to 'watch [his] back' regarding management targeting him." *Id.* at ¶ 52 (alteration in original).

Around June or July 2023, Payne "reapplied for medical accommodations that he was not being provided," and "[a]round the same time," Payne "made a complaint about not being able to wear a military hat at work." *Id.* at ¶¶ 53–54.  "[M]ultiple members of management interfered with" Payne's "medical[-]accommodations process and complaint process regarding wearing his military hat at work." *Id.* at ¶ 55.  "About three months later," Payne's "medical accommodations were approved with modifications," and his "work restrictions were approved without lifting restrictions." *Id.* at ¶¶ 56–57.  Around June 2023, one of Payne's co-workers "warned" Payne that Ursula Williams, Maddox, "and other members of management mentioned firing" him "for/if" he "filed complaints naming them." *Id.* at ¶ 58.  Ursula Williams and

3

Maddox "made comments regarding complaints submitted against them[,] making them feel targeted and showing a lack of respect for them." *Id.* at ¶ 59.

Around July 2023, Payne "felt somebody grabbing the left side of his buttocks" when he "was near the grocery self-checkout machines." *Id.* at ¶ 61. "The employee who grabbed" Payne's "buttocks was a young female employee by the name of Kailee Bess," who "was/is in her 20s." *Id.* at ¶¶ 63–64. "Shortly after" the incident, when Payne "went to lunch, he noticed . . . Bess laughing about it." *Id.* at ¶ 65. After lunch, "a manager came and got" Payne, "told him that he was needed in" Kris Williams's office, and "escorted [Payne] to the office." *Id.* at ¶¶ 66–67. Williams and another employee named Josh were in the office, and Payne "was directed to provide a written statement, which he did." *Id.* at ¶¶ 68–69.

Payne "was told that someone from Ethics would reach out to him, but they never did," and around July 2023, Payne "was issued a final or 'red' disciplinary action." *Id.* at ¶¶ 70–71. Payne understood that "the next step in Walmart's disciplinary process [was] termination." *Id.* at ¶ 72. Bess, however, "received no disciplinary action for grabbing" Payne's "buttocks without his consent." *Id.* at ¶ 73. Around October 2023, Bess "was finally transferred to a different area." *Id.* at ¶ 74.

Payne turned 40 years old on November 6, 2023, and throughout 2023, he "attempted to transfer to a different position under different manager(s) (over 20 times), but was denied each time." *Id.* at ¶¶ 75–76. Payne "was told that Kris" Williams "had to approve any transfer of positions within the store," and although Payne "applied for many promotions to positions under different manager(s)," he "was denied the opportunity for career advancement." *Id.* at ¶¶ 77–78. "Throughout the latter half of 2022 and 2023," Payne "and his co-workers made numerous complaints to Walmart regarding unlawful and/or discriminatory employment practices." *Id.*

4

at ¶ 79.  "Complaints were submitted to Kris" Williams "directly," as well as numerous other individuals and departments.  *Id.* at ¶ 80.

From "the summer of 2023 through the spring of 2024," Payne "consistently experienced similar issues while working under the management of" Maddox, Ursula Williams, and Kris Williams regarding Payne's "disability, sex, and/or age."  *Id.* at ¶ 82.  He "frequently experienced issues with" Maddox, Ursula Williams, and Kris Williams "threatening to write him up or fire him for nominal matters," including for "naming them in a complaint."  *Id.* at ¶ 83.  At least half a dozen times, Maddox and Ursula Williams "called" Payne "out while working in the [s]tore related to complaints that he had submitted against them."  *Id.* at ¶ 84.

"Younger, female, and/or non-disabled employees were treated more favorably than" Payne, "despite their performance being rated as below his," and "[y]ounger, female, and/or non-disabled employees received less or no disciplinary action for engaging in the same or similar alleged conduct that" Payne "did."  *Id.* at ¶¶ 85–86.  Around March 2024, Payne "made a complaint to [h]uman [r]esources regarding the discrimination and harassment based on disability, sex, and/or age that he was experiencing at the store."  *Id.* at ¶ 87.  "On one or more occasions, Kris" Williams told Payne "to go ahead and file a complaint or charge of discrimination with the" Equal Employment Opportunity Commission "and that he did not think that they would find in" Payne's "favor because it did not apply to 'his' [s]tore."  *Id.* at ¶ 88.

On or around April 4, 2024, Walmart terminated Payne, "allegedly for a 'lack of respect.'"  *Id.* at ¶ 89.  Payne "asked what the allegation of a 'lack of respect' against him meant, but he received no explanation."  *Id.* at ¶ 90.  Kris Williams handed Payne "the termination notice with his final check and then told him to leave, which he did."  *Id.* at ¶ 91.

5

**B.     Procedural background**

Payne filed this case in state court, and Wal-Mart Stores East, LP removed it to this Court. Doc. 1 at 1 (The Court cites to page numbers as assigned by CM/ECF.); *see id.* n.1 (explaining that Payne "named 'Wal-Mart Stores East I, LP' as a Defendant, but the correct entity name is 'Wal-Mart Stores East, LP'"). In his complaint, Payne alleged that Walmart violated the Missouri Human Rights Act by (i) discriminating on the basis of disability and failing to accommodate Payne's disabilities, doc. 6 at ¶¶ 96–108; (ii) subjecting Payne to a hostile work environment based on disability, *id.* at ¶¶ 109–22; (iii) discriminating on the basis of age, *id.* at ¶¶ 123–33; (iv) subjecting Payne to a hostile work environment based on age, *id.* at ¶¶ 134–45; (v) discriminating on the basis of sex, *id.* at ¶¶ 146–57; (vi) subjecting Payne to a hostile work environment and sexual harassment, *id.* at ¶¶ 158–69; and (vii) retaliation, *id.* at ¶¶ 170–76. Payne also alleged that Bess assaulted and battered him. *Id.* at ¶¶ 177–89. Payne now moves to remand this case to state court, arguing that Walmart improperly removed it based on the fraudulent-joinder doctrine. Docs. 20–21, 26.

**II.     Standard**

A defendant may remove to federal court any state-court civil action over which the federal court could exercise original jurisdiction, 28 U.S.C. § 1441(a), including "all civil actions where the matter in controversy exceeds" $75,000, "exclusive of interest and costs, and is between . . . citizens of different States," 28 U.S.C. § 1332(a)(1). A "plaintiff cannot defeat a defendant's 'right of removal' by fraudulently joining a defendant who has 'no real connection with the controversy.'" *Knudson v. Sys. Painters, Inc.*, 634 F.3d 968, 976 (8th Cir. 2011) (quoting *Chesapeake & Ohio Ry. Co. v. Cockrell*, 232 U.S. 146, 152 (1914)).

6

To prove fraudulent joinder, a defendant must show that the plaintiff's claim against the relevant defendant "has 'no reasonable basis in fact and law.'" *Id.* at 977 (quoting *Filla v. Norfolk S. Ry. Co.*, 336 F.3d 806, 810 (8th Cir. 2003)).  In other words, "if it is *clear* under governing state law that the complaint does not state a cause of action against the non-diverse defendant, the joinder is fraudulent." *Id.* at 980 (quoting *Filla*, 336 F.3d at 810).  On the other hand, "joinder is not fraudulent where 'there is arguably a reasonable basis for predicting that the state law might impose liability based upon the facts involved.'" *Id.* (quoting *Filla*, 336 F.3d at 811).

This standard "require[s] the defendant to do more than merely prove that the plaintiff's claim should be dismissed pursuant to a Rule 12(b)(6) motion." *Id.* (citation omitted).  "[I]f there is a 'colorable' cause of action—that is, if the state law *might* impose liability on the resident defendant under the facts alleged—then there is no fraudulent joinder." *Filla*, 336 F.3d at 810.  The Court "resolve[s] all facts and ambiguities in the current controlling substantive law in the plaintiff's favor," *id.* at 811, and if the sufficiency of the complaint is questionable, the "better practice" is "to remand the case and leave the question for the state courts to decide," *id.* (quoting *Iowa Pub. Serv. Co. v. Med. Bow Coal Co.*, 556 F.2d 400, 406 (8th Cir. 1977)).

### III. Discussion

The parties agree that Payne and Walmart are citizens of different states and that the amount in controversy exceeds $75,000 exclusive of interest and costs. *See* doc. 1 at ¶¶ 8–9, 13, 30–34; doc. 6 at ¶¶ 3–4; docs. 21, 26 (failing to dispute Payne's citizenship or the amount in controversy).  And so if Payne fraudulently joined Bess, as Walmart asserts, the Court has subject-matter jurisdiction under section 1332(a)(1), and the Court must dismiss Payne's assault-and-battery claim against Bess, *see Johnson v. Midwest Div. – RBH, LLC*, 88 F.4th 731,

736 (8th Cir. 2023). But if the Court concludes that fraudulent joinder did not occur, the Court must remand this case to state court for lack of subject-matter jurisdiction because, as the parties acknowledge, Bess is a citizen of the same state (Missouri) as Payne. Doc. 1 at ¶ 10; doc. 21 at 10; 28 U.S.C. § 1332(a)(1); 28 U.S.C. § 1447(c).

Walmart argues that Payne fraudulently joined Bess to avoid removal to federal court. Doc. 1 at ¶¶ 10, 12. In Walmart's view, "[t]here is no reasonable basis in fact or law supporting the common law 'Assault/Battery' claim" that Payne "alleged against" Bess "because it is preempted by the Missouri Human Rights Act." Doc. 25 at 1. Payne, on the other hand, argues that the Missouri Human Rights Act does not preempt his assault-and-battery claim because he pleaded "a colorable claim" for assault and battery, doc. 21 at 1, based on conduct "performed . . . outside and beyond the scope of" Bess's "employment with" Walmart, *id.* at 9.

The Missouri Human Rights Act states:

It shall be an unlawful discriminatory practice for an employer, employment agency, labor organization, or place of public accommodation:

> (1) To aid, abet, incite, compel, or coerce the commission of acts prohibited under this chapter or to attempt to do so;
>
> (2) To retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter or because such person has filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding or hearing conducted pursuant to this chapter;
>
> (3) For the state or any political subdivision of this state to discriminate on the basis of race, color, religion, national origin, sex, ancestry, age, as it relates to employment, disability, or familial status as it relates to housing; or
>
> (4) To discriminate in any manner against any other person because of such person's association with any person protected by this chapter.

8

Mo. Rev. Stat. § 213.070.1.  In 2017, Missouri made several amendments to the Missouri Human Rights Act and its applicable definitions, Missouri Revised Statute § 213.010.  For example, Missouri made section 213.070, and two other statutes, "the exclusive remedy for any and all claims for injury or damages arising out of an employment relationship."  Mo. Rev. Stat. § 213.070.2.  In other words, section 213.070.2 preempts any and all claims for injury or damages that arise out of an employment relationship.

Thus, the fraudulent-joinder analysis raises the question of whether "there is arguably a reasonable basis for predicting that" section 213.070.2 does *not* preempt Payne's assault-and-battery claim against Bess, an individual defendant whom Walmart also employed when the alleged events occurred.  *Knudson*, 634 F.3d at 980 (quoting *Filla*, 336 F.3d at 811).  The Court finds that a reasonable basis does exist.

The Missouri Humans Right Act does not define any of the operative terms that make up the exclusive-remedy provision.  *See* Mo. Rev. Stat. §§ 213.010, 213.070.  And neither party has identified any caselaw that interprets it.  *See* docs. 20–21, 25–26.  Nor has the Court, in its independent research, found any.  The absence of guidance from Missouri state courts leaves the Court with lingering questions about the scope of the exclusive-remedy provision and how it applies here.

Payne premises his assault-and-battery claim on the allegation that, "when [he] was near the grocery self-checkout machines, [he] felt" Bess "grabbing the left side of his buttocks."  Doc. 6 at ¶ 61; *see id.* at ¶ 63.  Further, when Payne "went to lunch" shortly after the incident occurred, he saw "Bess laughing about it."  *Id.* at ¶ 65.  And so the alleged facts imply that the relevant conduct arises, in some form, from an employment relationship.  After all, Payne alleges

9

that the incident took place "near the grocery self-checkout machines"—presumably inside the Walmart store that both Payne and Bess worked at during that time. *Id.* at ¶ 61.

Payne's allegations, however, do not specify whether, at the time of the alleged incident, either Bess or he were on the clock or taking part in their expected job duties. *See* doc. 6. Further, Payne argues that "Bess performed these actions outside and beyond the scope of her employment with" Walmart. *Id.* at ¶ 184; *see also* doc. 21 at 2 ("The last tort has been pled as having been committed outside the scope of [Bess's] employment."). And certainly touching a co-worker (or being touched by a co-worker) in the manner that Bess allegedly touched Payne fell outside the scope of both Bess's and Payne's employment relationship with each other and their respective employment relationships with Walmart. So does section 213.070.2 preempt claims that arise partially from an employment relationship, or does it preempt only claims that arise wholly from an employment relationship? How broadly (or narrowly) must a court understand the "arising out of an employment relationship" language? Relatedly, does section 213.070.2 preempt a claim when the facts giving rise to it clearly fall outside the duties part and parcel of the respective employee's employment relationship with his or her employer? Likewise, does a claim "aris[e] out of an employment relationship" when the conduct giving rise to it was not work purposes? If so, under what circumstances?

The parties' dueling authorities and arguments highlight precisely why "better practice" counsels that this Court "remand the case and leave" these lingering questions "for the state courts to decide." *Filla*, 336 F.3d at 811 (quoting *Iowa Pub. Serv. Co.*, 556 F.2d at 406). For his part, Payne cites half a dozen cases where lower courts remanded "employment[-]discrimination cases against employers where there [was] also a colorable claim of assault and/or battery pled against a co-worker." Doc. 26 at 3–4 (emphasis omitted) (citing cases). Payne's core point:

10

"not a single court has reached th[e] conclusion" that "allegations of assault/battery against a non-diverse co-worker are preempted by the" Missouri Human Rights Act. *Id.* at 2. But as Walmart responds, the facts pleaded in those cases distinguish them from Payne's allegations here. *See* doc. 25 at 7–10.

Walmart primarily counters that "the same facts underlying" Payne's "sexual[-]harassment claim against Walmart . . . also underlie" Payne's assault-and-battery claim against Bess. Doc. 25 at 4; *cf. Johnson*, 88 F.4th at 735–36 (affirming the denial of a remand motion, in part, because the plaintiff (i) brought two common-law claims "against both her employer and" the individual defendant, "based on the same facts," and (ii) pleaded "the same factual allegations" underlying both her claim for unlawful infliction of emotional distress and her claims under the Missouri Human Rights Act). But while most of Walmart's arguments regarding Payne's allegations tend to place form over substance, *see* doc. 25 at 4–5 (highlighting that Payne "details his allegations against" Bess "throughout . . . the section . . . titled 'ALLEGATIONS COMMON TO ALL COUNTS'" (quoting doc. 6 at 3)), Payne makes clear that "Bess performed" the alleged assault and battery "outside and beyond the scope of her employment with" Walmart, doc. 6 at ¶ 184; *see* doc. 21 at 2, 9.

Also, Walmart's conclusion that "there is no such question . . . that the same facts underlie both" Payne's "sex[-]harassment claims against Walmart and his" assault-and-battery claim against Bess seems particularly oversold. Doc. 25 at 7. Probing Payne's allegations for a moment, the Court observes a distinction between the facts that, on the one hand, correlate to Payne's assault-and-battery claim against Bess, *see* doc. 6 at ¶¶ 61–73; *see also id.* at ¶¶ 177–89, and the facts that, on the other, relate to Payne's claims for sex discrimination and hostile-work environment due to sexual harassment, *see, e.g., id.* at ¶¶ 27–30, 39–40, 45–48, 82, 85–87, 92–

11

93; *see also id.* at ¶¶ 146–57, 158–69.  Sure, as Walmart notes, Payne acknowledges that Bess "was a 'female co-worker,'" and he included facts of Bess's alleged conduct in his previously submitted charge of discrimination against Walmart, doc. 25 at 8; *see* doc. 6-3, but those contentions—absent guidance from Missouri state courts on the scope of the exclusive-remedy provision—cannot conclusively fuse Payne's Missouri Human Rights Act claims against Walmart and his common-law claim against Bess.

Separately, Payne's alleged facts and the questions discussed above beget yet another question of from whose "employment relationship" must a claim arise—the claimant's (e.g., Payne's employment relationship with Walmart), the alleged wrongdoer's (e.g., Bess's employment relationship with Walmart), neither, or both?  *See, e.g.*, *Alst v. Mo. CVS Pharmacy, LLC*, No. 4:20-cv-00155-NKL, 2020 WL 2319882, at *2 (W.D. Mo. May 11, 2020) (remanding the case because the plaintiff alleged that the conduct occurred "outside and beyond the scope of *her* employment" (emphasis added)); *Matthews v. Syncreon.US, Inc.*, No. 20-CV-6140-SRB, 2020 WL 6538332, at *3 (W.D. Mo. Nov. 6, 2020) (remanding a case where the plaintiff alleged, in the alternative, that the individual defendant acted outside the scope of *his* employment relationship *with the employer defendant*); *Johnson v. Hertz Corp.*, No. 4:24-cv-00827-SRC, 2024 WL 4751310, at *3 (E.D. Mo. Nov. 12, 2024) (remanding the case where the plaintiff alleged that her claims against the individual defendant for assault and battery "occurred outside the scope of her employment relationship with" *the individual defendant* (citation omitted)).  True enough that Walmart's argument—that Payne's complaint and his charge of discrimination contended that "the alleged assault/battery occurred within the scope of both" Payne's and Bess's respective "employment relationship[s] with Walmart"—may ring true.

12

Doc. 25 at 4 (emphasis omitted).  But what if, as the Court previously noted, Bess's conduct falls outside her employment relationship *with Payne*?

At any rate, the Court could answer various of the lingering questions that it has posed in favor of either Payne or Walmart.  But at this stage, the Court need not, and should not, definitively resolve those questions.  *Filla*, 336 F.3d at 811.  Instead, Missouri state courts should have the first opportunity to determine these important issues of state law.  After all, the interpretation of a Missouri statute, and the co-existence of that statute with a state common-law cause of action, is the bailiwick of Missouri state courts.  Thus, for purposes of the jurisdictional analysis, the Court resolves the lingering questions in favor of Payne and in favor of remand.  *Id.*

## IV.   Conclusion

Accordingly, the Court grants Payne's [20] Motion for Remand.  On that basis, the Court denies as moot Walmart and Bess's [9] Partial Motion to Dismiss.  Pursuant to 28 U.S.C. § 1447(c), the Court remands this case to the Circuit Court of Franklin County, Missouri, and directs the Clerk of Court to mail a certified copy of this order of remand to the clerk of the state court.  A separate order of remand accompanies this memorandum and order.

So ordered this 15th day of August 2025.

*SL R. CR*

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE